UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**FILED**

**SEP 2 9 2010**

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

|  |  |  |
|---|---|---|
| THEODORE ROOSEVELT CONSERVATION PARTNERSHIP, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Case No. 08-1047 (RJL) |
| KEN SALAZAR[1], *et al.*, | ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM OPINION
(September 29, 2010) [#23, #27, #29, #37]

Plaintiff Theodore Roosevelt Conservation Partnership ("plaintiff" or "TRCP"), a

nonprofit corporation dedicated to preserving hunting and fishing, filed this action

pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 *et seq.*, against

defendants Ken Salazar, Secretary of the United States Department of the Interior, and

the United States Bureau of Land Management ("BLM") (collectively, "federal

defendants"), seeking declaratory and injunctive relief regarding the BLM's oil and gas

operations in the Pinedale Anticline Project Area ("PAPA") in western Wyoming.

Defendant-intervenors Questar Market Resources, Inc., SWEPI LP, and Ultra Resources,

Inc. (collectively, "defendant-intervenors"), are natural gas producers that own and

---

[1] The Court has substituted Ken Salazar, the current Secretary of the Interior, for the
former Secretary, Dirk Kempthorne, as a defendant in this case pursuant to Rule 25(d) of
the Federal Rules of Civil Procedure.

1

operate federal leases in the PAPA. They intervened in this action shortly after the filing of the amended complaint.

Now before the Court are TRCP's motion for summary judgment and the defendants' cross-motions for summary judgment. After careful consideration of the pleadings, the relevant law, oral arguments of counsel, and the entire record, the Court hereby GRANTS the defendants' cross-motions for summary judgment and DENIES the plaintiff's motion for summary judgment.

## BACKGROUND

The PAPA consists of approximately 198,000 acres of federal, state, and private land in western Wyoming. AR 31135. Approximately 80% of the PAPA is administered by the BLM. *Id.* All but approximately 5,000 acres of the federal minerals in the PAPA have been leased to oil and gas companies ("Operators"), some of whom are defendant-intervenors in this case. AR 06401. Few of those leases contain a no surface occupancy stipulation. *Id.* Though the presence of natural gas had previously been confirmed in the PAPA as early as 1939, it was not until the late 1990s that advances in drilling technology allowed extraction in commercial quantities. AR 06536. Today, the PAPA is estimated to be the third-largest natural gas field in the nation, and to be capable of producing 25 trillion cubic feet of natural gas—enough to heat 10 million homes for 30 years. AR 48904; AR 28196; Tr. Oral Arg. (June 4, 2010) ("Tr. Oral Arg.") 18:14-16.

In 1988, the BLM prepared a Resource Management Plan ("RMP") for the region that governed operations in the PAPA. AR 50954-51077. In May 1998, the BLM authorized exploratory drilling of 14 drill pads in the PAPA, and announced plans to

2

initiate a comprehensive environmental analysis that summer. AR 00733. The results of the analysis, which assessed the potential impacts of increased natural gas drilling, including not only the wells but the associated access roads, pipelines, and facilities, were finalized in 2000 in the BLM's Draft and Final Environmental Impact Statements ("EIS"). AR 06394-06989; AR 06049-06392. In July 2000, the BLM issued its Record of Decision ("ROD") approving the PAPA Operators' proposal for the construction of 700 producing well pads in the PAPA over the following 10 to 15 years, but imposing general seasonal restrictions on development. AR 05797-06048.

Both the EIS and the ROD noted that significant uncertainty surrounded development of the PAPA. AR 06423-25; AR 05817; AR 05968. Accordingly, the 2000 ROD also called for a monitoring and mitigation process known as Adaptive Environmental Management ("AEM"). AR 05817-18. AEM was to be run by a body known as the Pinedale Anticline Working Group ("PAWG"), which would oversee Task Groups designated by subject matter (e.g., wildlife, water resources, air quality, etc.). *See, e.g.*, AR 05970. Due to an unrelated lawsuit, however, the PAWG did not officially convene until May 2004. AR 25304. The parties disagree as to whether AEM was ever performed.

After the approval of the 2000 ROD, as more resources were discovered in the PAPA and as extraction technology continued to improve, the BLM authorized a series of exceptions to the seasonal drilling requirements at the request of one of the Operators. AR 49026; AR 09415. In 2005, the Operators proposed a new long-term development plan that provided for the drilling of 4,399 additional wells and elimination of the

3

seasonal restrictions. AR 49027. In response, the BLM prepared and issued a Draft

Supplemental EIS ("DEIS") in December 2006, analyzing three alternatives. *See* AR

19978-21396. Alternative A, the "no action" alternative, assumed no changes in

management from the 2000 ROD. AR 20008. Alternative B, the Proposed Action

alternative, included year-round drilling in specified areas and completion of up to 4,399

additional wells. *Id.* Alternative C, the preferred alternative, was similar to Alternative

B, but instead of designating where year-round drilling could occur, it specified where

year-round drilling could not occur, and included a smaller core area than Alternative B.

*Id.*; AR 200054. After receiving public and agency comments, the BLM issued a

Revised Draft SEIS in December 2007, adding two additional alternatives, including a

reduced-pace alternative (Alternative E) and a new preferred alternative. *See* AR 21397-

22141. The new preferred alternative, Alternative D, was similar to Alternatives B and C

in that it provided for development of 4,399 additional wells and lifted seasonal

restrictions, but contained a larger core made up of five development areas, a five-year

voluntary lease suspension by the Operators in a flank area surrounding the core, and

other additional mitigation measures. AR 21458-68.

 A Final SEIS was issued on June 27, 2008. *See* AR 48982-49757. In September

2008, a new ROD ("2008 ROD") superseding the 2000 ROD was issued adopting

Alternative D. AR 31128-31217. In November 2008, the BLM also issued a revised

RMP ("2008 RMP") for the Pinedale Area that replaced the 1988 Pinedale RMP. Notice

of Availability of Record of Decision for the Pinedale Resource Management

Plan/Environmental Impact Statement, 74 Fed. Reg. 828 (Jan. 8, 2009).

4

TRCP filed this suit on June 18, 2008, prior to the issuance of the 2008 Final SEIS, 2008 ROD, and 2008 RMP. It amended its complaint on October 20, 2008 to include claims pertaining to both the 2000 ROD and 2008 SEIS and ROD. Specifically, TRCP alleges violations of the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. §§ 4321 *et seq.*, and the Federal Land Policy and Management Act of 1976 ("FLMPA"), 43 U.S.C. §§ 1701 *et seq.* and seeks declaratory and injunctive relief under the APA.

## DISCUSSION

The parties' cross motions for summary judgment are now before the Court, which is appropriate in a case such as this, where this Court's review is based entirely on the administrative record. *See Mineral Policy Ctr. v. Norton*, 292 F. Supp. 2d 30, 36 (D.D.C. 2003). Of course, summary judgment will only be granted if one of the moving parties is entitled to judgment as a matter of law and there are no genuine issues of material fact. Fed. R. Civ. P. 56. Because neither NEPA nor FLPMA creates a private right of action, review of agency compliance with those statutes is conducted under the APA. *Theodore Roosevelt Conservation Partnership v. Salazar* ("*TRCP*"), No. 09-5162, slip op. 12 (D.C. Cir. July 23, 2010). Under the APA, agency action can be set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

For the following reasons, I find that BLM's decisions did not violate either NEPA or

FLPMA and thus cannot be set aside.

## A. Standing

As a preliminary matter, I find that TRCP has organizational standing to pursue

this suit. An association has standing to bring suit on behalf of its members when its

members would have individual standing, the interests at stake are germane to the

organization's purpose, and neither the claim nor the relief requested requires

participation of the organization's individual members. *Hunt v. Washington State Apple

Adver. Comm'n*, 432 U.S. 333, 343 (1977). Relying on *Lujan*, the federal defendants

argue that TRCP lacks standing because its member, Dr. Rollin Sparrowe, does not

identify in his declaration any specific plans to return to the PAPA in the future. Fed.

Defs.' Cross-Mot. for Summ. J. ("Fed. Defs. Cross-Mot.") 19 (citing *Lujan v. Defenders

of Wildlife*, 504 U.S. 555 (1992)). In *Lujan*, the plaintiffs, both United States citizens and

residents, intended to return to Egypt or Sri Lanka, where the injury would be suffered,

but did not know when or have plans to do so. *Lujan*, 504 U.S. at 563-64. However, in

this case, Dr. Sparrowe is a resident of Daniel, Wyoming, a town that is mere miles from

the land in question. *See* Am. Compl., Sparrowe First Decl. ¶1, June 11, 2008. Not

surprisingly, Dr. Sparrowe has enjoyed wildlife viewing and hunting in the PAPA for

over a decade, and continues to do so to this day. *Id.* ¶20. Moreover, Dr. Sparrowe also

expresses his intention to continue to hunt and enjoy wildlife in the PAPA in the future,

provided hunting is permitted. *Id.* I find his expression of future intent to be sufficiently

reliable and concrete to support a finding of "actual or imminent" injury required for standing. *Lujan*, 504 U.S. at 560.[2]

## B. 2008 ROD

### 1. BLM Did Not Violate the FLMPA.

#### a. BLM's determination that "unnecessary or undue degradation" would not occur is supported by the record.

The FLMPA directs the Secretary of the Interior to "take any action necessary to prevent unnecessary or undue degradation of the [public] lands." 43 U.S.C. § 1732(b). TRCP argues that the 2008 ROD does not implement adequate mitigation measures sufficient to prevent unnecessary or undue degradation, and thus challenges the BLM's determination that such degradation will *not* occur as arbitrary and capricious. *See* Tr. Oral Arg. 12:3-5.

As a preliminary matter, the parties disagree as to what constitutes "unnecessary or undue degradation" under the statute. Plaintiff and the federal defendants cite an interpretation of the terms as used in the mining context, which define "unnecessary" as "that which is not necessary for mining" (or, in this context, "for oil and gas development") and "undue" as "that which is excessive, improper, immoderate or unwarranted." *See* Fed. Defs. Cross-Mot. 34 (quoting *Utah v. Andrus*, 486 F. Supp. 995, 1005 n.13 (D. Utah 1979)); Pl.'s Opp'n/Reply 31 n.18. The federal defendants and defendant-intervenors also rely on a decision from the Interior Board of Land Appeals (IBLA), which has found that in the oil and gas context, a finding of unnecessary or

---

[2] Ultimately, however, whether or not TRCP has standing does not affect the outcome of this suit.

7

undue degradation requires a showing "that a lessee's operations are or were conducted in a manner that does not comply with applicable law or regulations, prudent management and practice, or reasonably available technology, such that the lessee could not undertake the action pursuant to a valid existing right." Def. Intvrs.' Cross-Mot. for Summ. J. ("Def.-Intvrs.' Cross-Mot.") 19; Fed. Defs. Cross-Mot. 34 (both quoting *Colorado Env't Coalition*, 165 IBLA 221, 229 (2005)).

Nevertheless, the plaintiff challenges the BLM's determination that the following practices would *not* lead to unnecessary or undue degradation as arbitrary and capricious: (1) the removal of seasonal restrictions in the core; (2) continuance of a 0.25 mile buffer around sage grouse breeding grounds (also known as "leks"); (3) plans for concentrated development in the core area and voluntary lease suspension in the flanks; (4) creation of the mitigation fund and means of subsequent funding; and (5) adoption of the mitigation matrix. The plaintiff cites to specific comments in the record, relying heavily on the Fish and Wildlife Service's ("FWS") comment letter indicating that these practices may not benefit wildlife and that the mitigation measures would not protect against environmental decline. Pl.'s Opp'n/Reply 33-35 (citing, e.g., AR 10749, AR 51275-88, AR 11017, AR 11106).

Even assuming that the lower standard of unnecessary or undue degradation from the mining context applies in this situation, the BLM's determination that such degradation would not occur is supported by the record. Though plaintiff would prefer stronger protection of wildlife, especially the sage grouse, the BLM's responsibility under the FLMPA is to ensure that public lands are managed "under principles of

multiple use and sustained yield." 43 U.S.C. § 1732(a). "'Multiple use management' is a deceptively simple term that describes the enormously complicated task of striking a balance among the many competing uses to which land can be put, 'including, but not limited to, recreation, range, timber, minerals, watershed, wildlife and fish, and [uses serving] natural scenic, scientific and historical values.'" *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 58 (2004) (alteration in original) (quoting 43 U.S.C. § 1702(c)). BLM's second goal, sustainable yield, "requires BLM to control depleting uses over time, so as to ensure a high level of valuable uses in the future." *Id.* (citing 43 U.S.C. § 1702(h)). Accordingly, the BLM was not required, under FLMPA, to adopt the practices best suited to protecting wildlife, but instead to balance the protection of wildlife with the nation's immediate and long-term need for energy resources and the lessees' right to extract natural gas.[3]

The BLM recognized the need for increased development and thoroughly examined the effects of lifting seasonal restrictions and concentrating activity as a means of achieving it while at the same time offering protections to wildlife. It evaluated the potential benefits of its mitigation and monitoring plan, and the ways in which it could decelerate the inevitable harms to wildlife associated with increased development. *See*

---

[3] The Court recognizes, as it must, that the BLM has limited authority to impose restrictions on the natural gas leases at issue. In particular, "[t]he BLM cannot dictate the number of wells unless a limit is stipulated at the time the lease is issued. In this case, all existing leases carry no such stipulation. The leaseholder has the legal right and obligation to drill as many wells as necessary to extract the natural gas within their lease." AR 28387; *see also Sierra Club v. Peterson*, 717 F.2d 1409, 1411 (D.C. Cir. 1983) ("On land leased without a No Surface Occupancy Stipulation the Department *cannot* deny the permit to drill; it can only impose 'reasonable' conditions which are designed to mitigate the environmental impacts of the drilling operations.").

*generally* AR 49419-21 (discussing Alternative D's impact on wildlife). Alternative D

included several mitigation steps designed to decrease impact, such as a liquid gathering

system and centralized processing and storage; computer assisted remote monitoring of

producing wells; coordinating transportation routes and bussing of workers; provisions

for concentrating activity geographically and seasonally; and the creation of a monitoring

and mitigation fund dedicated to fund monitoring and on- and off-site mitigation (such as

acquiring conservation easements on land adjacent to the PAPA) as needed. AR 49596-

600; AR 49608-13. The BLM evaluated the benefits of these enhanced mitigation

measures as reducing surface disturbance (including traffic and human activity), and

preserving "large contiguous undisturbed blocks of habitat and migration corridors." AR

49608. They also provided for earlier well pad reclamation and reduced air emissions.

*Id.*

It is clear that the BLM's determination that these provisions would prevent

unnecessary or undue degradation is supported by the record. *See, e.g.*, AR 31140-47;

*see also* AR 28388 ("The drilling of multiple wells from a single pad, the consolidation

of production facilities, the use of existing roads wherever possible and other measures

are just some of the mitigation practices that reduce the impacts of drilling."). Indeed, the

Wyoming Game and Fish Department ("WGFD") supported the BLM's decision to lift

the seasonal restrictions, noting that "[s]ince seasonal stipulations only provide protection

during a part of each year, intense development activities can continue to have impacts on

habitats during the rest of each year, and cumulative annual increases in those impacts

over a period of years will become significant," and that the BLM's preferred alternative

served to mitigate those cumulate impacts. AR 28029. The WGFD also made several

other recommendations for the benefit of wildlife, which were adopted by the BLM. *See*

*generally* AR 28028-37 (recommending inclusion of, among other measures, directional

drilling, central gathering and processing, remote monitoring, bussing of crews, annual

monitoring, the provision of up-front funding for mitigation, and reclamation as benefits

to wildlife and habitats). Though the BLM may not have selected procedures and

methods *best* suited for the protection of wildlife, its determination that unnecessary or

undue degradation would not result from the measures it ultimately *did* select is not

arbitrary and capricious.

The 2008 ROD also committed the Operators and the BLM to a Wildlife

Monitoring and Mitigation Matrix implementing monitoring and sequential mitigation

measures. *See* AR 49601-06. In addition to monitoring, the mitigation measures provide

first for protection of the flank areas, habitat enhancements, and conservation easements

as a means of compensating for the impact to wildlife; and finally, for adjustments of the

special arrangement and/or pace of development to mitigate the cause of the impact. AR

49606; AR 49420-21. They are consistent with the BLM's judgment that concentrated

activity in already-impacted zones would present the best compromise between natural

gas extraction and its attempts to stem, but not halt, the attendant impacts on wildlife. In

sum, though commentators, as well as TRCP, may have disagreed with BLM's ultimate

determination, the 2008 SEIS and ROD support the BLM's balancing of the need for

heightened natural gas production against foreseeable declines in wildlife, and its

ultimate determination that unnecessary or undue degradation would not occur.

### b. TRCP's claims regarding violations of the 1988 RMP are moot.

In its opening brief TRCP contends that by lifting the seasonal drilling restrictions, the 2008 ROD expressly violates the 1988 RMP, which requires implementation of seasonal restrictions to protect wildlife. The FLPMA prohibits BLM from taking actions inconsistent with RMPs. 43 U.S.C. § 1732(a); 43 C.F.R. § 1610.5-3(a); *see also S. Utah Wilderness Alliance*, 542 U.S. at 69.

Defendants argue that the 2008 ROD did not violate the1988 RMP, which allowed for case-by-case exceptions to the seasonal restrictions requirement (AR 50967), and that nevertheless, plaintiff's claim is moot due to the issuance of a new RMP in November 2008. *See* Notice of Availability of Record of Decisions for the Pinedale Resource Management Plan/Environmental Impact Statement, 74 Fed. Reg. 828 (Jan. 8, 2009). I agree. The BLM accounted for the issuance of the new RMP, which was already in draft form, into its 2008 ROD (*see, e.g.*, AR 31138; Tr. 23:24-24:3), and once the new RMP was issued (subsequent to TRCP's filing of the Amended Complaint), this claim became moot. Moreover, plaintiff appears to have conceded these arguments by failing to address them in its opposition/reply.

### 2. The BLM Did Not Violate NEPA.

Under NEPA, an agency must prepare an EIS examining the environmental impact of a proposed action (and several alternatives) for every "major Federal action significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). "An EIS must be detailed, and it must be prepared in consultation with other federal

agencies with special expertise relevant to the proposed action's environmental impact."

*TRCP*, No. 09-5162, slip op. at 3 (citing 42 U.S.C. § 4332(2)(C)). Preparation of an EIS

"serves NEPA's 'action-forcing' purpose" by ensuring that the agency considers

"detailed information concerning significant environmental impacts" and by

"guarantee[ing] that the relevant information will be made available to the larger

audience that may also play a role in both the decisionmaking process and the

implementation of that decision." *Robertson v. Methow Valley Citizens Council*, 490

U.S. 332, 349 (1989). Accordingly, NEPA requires that an agency take a "hard look" at

the environmental consequences of the proposed course of action, *Marsh v. Oregon*

*Natural Res. Council*, 490 U.S. 360, 374 (1989), and "consider every significant aspect of

the environmental impact of a proposed action," *Baltimore Gas & Elec. Co. v. Natural*

*Res. Def. Council, Inc.*, 462 U.S. 87, 97 (1983) (quotation omitted).

However, "it is now well settled that NEPA itself does not mandate particular

results, but simply prescribes the necessary process." *Robertson*, 490 U.S. at 350.

Because "NEPA merely prohibits uniformed—rather than unwise—agency action," in

determining whether a NEPA violation occurred and the agency action is thus arbitrary

and capricious, the Court must not substitute its own judgment for that of the agency. *Id.*

at 351. Instead, "the Court must 'consider whether the decision was based on a

consideration of the relevant factors and whether there has been a clear error in

judgment.'" *Biodiversity Conservation Alliance v. U.S. Bureau of Land Mgmt.*, 404 F.

Supp. 2d 212, 216 (D.D.C. 2005) (quoting *Citizens to Preserve Overton Park v. Volpe*,

401 U.S. 402, 415-16 (1971)). TRCP argues that the BLM violated NEPA because its 2008 SEIS was deficient in the following respects. I disagree.

### a. BLM considered a "no action" alternative.

TRCP argues that the BLM failed to include a "no action" alternative in its 2008 SEIS as mandated under NEPA. 42 U.S.C. § 4332(2)(E); 40 C.F.R. § 1502.14(d). The "no action" alternative is required because it serves as a benchmark against which the other alternatives can be evaluated. *See* CEQ Forty Most Asked Questions (Q. No. 3).

The 2008 SEIS included analysis of Alternative A, the "no action" alternative. *See, e.g.*, AR 49058-63. Alternative A assumed that the "BLM would continue to manage natural gas development in the PAPA based on the provisions of the [2000 ROD] and subsequent Decision Records." AR 49058. Plaintiff contends, however, that because the BLM relied on an outdated figure estimating the number of producing wells in the PAPA that underestimated the actual state of development, Alternative A did not constitute a "no action" alternative. Pl.'s Mot. for Summ. J. ("Pl.'s Mot.")[4] 33-34.

However, the BLM did include the estimates of future well development in Alternative A, thus accounting for the additional wells built in the time between its last well count figure and the issuance of the 2008 SEIS. *See* AR 49062, Table 2.4-9 (estimating an additional 231 wells in 2007 and 235 wells in 2008); AR 49060 ("The No Action Alternative, through 2011, includes an additional 1,139 producing wells."). Alternative A thus presented a clear analysis of the impact of continuing with the then-

---

[4] Plaintiff amended its summary judgment motion to include citations to the supplemental administrative record on March 9, 2010 [#37]. All citations to plaintiff's motion are to the amended version.

present course of action. Accordingly, Alternative A appropriately considered the impacts of proceeding under the 2000 ROD, or taking "no action," as was required, and TRCP's claim on this ground must fail.

### b. BLM considered a reasonable range of alternatives.

Additionally, TRCP contends that the BLM should have included an "alternative that evaluated development in the PAPA in a manner originally contemplated under the 2000 ROD." Pl.'s Mot. 35. Because development in 2005 had already exceeded the pace dictated by the 2000 ROD, TRCP argues, BLM was obligated to evaluate an alternative that "scaled back" the pace of development. Not so.

Our Circuit Court has held that an agency "bears the responsibility for deciding which alternatives to consider in an environmental impact statement," and that its decision must only follow the "rule of reason." *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 195 (D.C. Cir. 1991) (citations omitted). The selection of alternatives must be reasonable, as defined in relation to the objectives of a particular action that the agency sets out. *Id.* at 195-96 (citing 40 C.F.R. §§ 1502.14(a)-(c), 1508.25(b)(2)). Under the rule of reason standard, the Court will "uphold an agency's definition of objectives so long as the objectives that the agency chooses are reasonable," and its "discussion of alternatives so long as the alternatives are reasonable and the agency discusses them in reasonable detail." *Id.* at 196.

The BLM's objective, in this case, was "to act upon the Proponents' proposal to revise the PAPA [2000] ROD to expand the level of development by drilling 4,399 new producing wells and to relax seasonal restrictions in certain areas." AR 49027. The

BLM was not required to approve this proposal—indeed, the very purpose of the SEIS was to evaluate the impacts of the proposal. Accordingly, the BLM analyzed five alternative scenarios, which, other than the "no action" alternative, each implemented the Proponents' proposal at varying degrees. Alternative A extended current management practices in the PAPA through 2011, including seasonal restrictions. Alternatives B, C, and D included year-round development through 2025, but in different core areas, with Alternatives C and D both having additional development areas. Alternative E assumed a slower pace of development, with development occurring through 2033, and included the seasonal restrictions but provided for additional well pads. *See, e.g.*, AR 49047-50. Given the decision the BLM faced—that is, whether or not to act upon the lease-holders' proposal—it was reasonable to examine different ways in which that proposal could be implemented compared against a baseline of no action. *See, e.g., Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.20 (1976) ("The statute, however, speaks solely in terms of Proposed actions; it does not require an agency to consider the possible environmental impacts of less imminent actions when preparing the impact statement on proposed actions."). The agency's objective did not involve *reducing* development, and thus the BLM's decision to omit a scaled-back development alternative from its analysis did not violate NEPA.

### c. BLM took a "hard look" at impact on hunting and sage grouse as a whole.

As discussed above, "[n]either [NEPA] nor its legislative history contemplates that a court should substitute its judgment for that of the agency as to the environmental consequences of its actions." *Kleppe*, 427 U.S. at 410 n.21. Instead, the court's role "is

to insure that the agency has taken a 'hard look' at the environmental consequences; it cannot 'interject itself within the area of discretion of the executive as to the choice of action to be taken.'" *Id.* (citation omitted). To say the least, this is not the first time this Court has had to evaluate the BLM's actions as they relate to protecting wildlife in this area of the country. *See Theodore Roosevelt Conservation Partnership v. Salazar ("TRCP")*, 605 F. Supp. 2d 263, 276 (D.D.C. 2009). Once again, BLM, for the following reasons, easily complied with its legal obligations set forth by Congress.

### i. Hunting

TRCP argues that "nowhere does BLM analyze how continued declines in big game and sage-grouse in the PAPA (expected under all alternatives) will affect the number of hunting and related recreational activities that will continue to be afforded in around the PAPA." Pl.'s Mot. 37. In particular, plaintiff claims that the failure to inform hunters of "how the project might affect the number of hunting opportunities they might be afforded if game populations decrease or collapse," or "what the WGFD might do with regard to the issuance of permits" constitute a failure by the BLM to take a hard look at the environmental consequences of its proposed action. Pl.'s Opp'n/Reply 17. I disagree.

In the 2008 SEIS, the BLM analyzed three sources of data for recreation-days spent hunting, including BLM data, WGFD data, and USFWS state-wide data.[5] *See* AR 49147-49. The BLM segregated the available data and found that days spent hunting

---

[5] A "recreation-day" is "one day spent by one person recreating." AR 49147.

both state-wide and in the vicinity of the PAPA had been declining, but days spent hunting within the PFO Administrative Area[6] had slightly increased.

More importantly, however, the BLM considered the project's effect on big game as well as game birds. Indeed, it would seem impossible to analyze the ramifications of proposed development on hunting without analyzing its impact on wildlife, and particularly big game and game birds, the objects of the hunt. The 2008 SEIS contains a lengthy evaluation of the potential impact of the proposed development on wildlife generally. *See* AR 49228-49247. It discussed population and migration trends for several big game species, such as pronghorn, mule deer, and elk, and evaluated the extent to which each species' habitat coincided with the PAPA and its response to increased development thus far. For example, the BLM noted that increased well pad development was likely to displace wintering mule deer to less-developed areas, which may not be as suitable. AR 49236. The SEIS goes on to set out a detailed analysis of the potential impacts of each alternative on each form of wildlife in the PAPA. *See* AR 49405-26. Ultimately the BLM concluded that "[d]ecreased hunting opportunities are expected in the PAPA with decreased abundance of big game and upland game birds as the density of wellfield development increases." AR 48993.

In sum, the BLM's extensive discussion of wildlife, and the proposed development's effects thereon, as well as its conclusions regarding hunting, constitute a hard look that undoubtedly satisfies the requirements of NEPA.

---

[6] "The PAPA comprises about 21 percent (198,037 acres) of the total PFO Administrative Area (approximately 930,000 acres)." AR 49147.

*ii. Sage grouse as a whole*

TRCP also claims that the BLM failed to take a hard look at the impacts on the sage grouse species (as opposed to the populations of sage grouse directly within and surrounding the PAPA), which has been classified as sensitive and is close to being endangered. *See* Pl.'s Mot. 38-39.[7] The BLM, plaintiff argues, was required by its own manual "to evaluate the potential for the 2008 ROD to hasten or otherwise contribute to the species' listing [under the Endangered Species Act]." *Id.* 40. Again, I disagree.

While NEPA may require a "cumulative impact analysis," or an assessment of "the impact the proposed project will have in conjunction with other *projects* in the same and surrounding areas," *TRCP*, No. 09-5162, slip op. at 3 (emphasis added), it does not require an unbounded analysis of an entire *species range* as the plaintiff here contends. *Compare Oregon Natural Res. Council v. Marsh*, 52 F.3d 1485 (9th Cir. 1995) (requiring cumulative impact analysis on fish from all dams in the area) *with Selkirk Conservation Alliance v. Forsgren*, 336 F.3d 944 (9th Cir. 2003) (upholding limited geographic scope of grizzly bear analysis). In *Selkirk*, the Ninth Circuit held that the Forest Service's decision to limit its analysis of a project on grizzly bears to a specific geographic area satisfied NEPA, noting that the agency was "allowed to consider 'practical considerations of feasibility' in its selection of a geographic scope for an EIS." 336 F.3d at 960 (quoting *Kleppe*, 427 U.S. at 412).

---

[7] On March 12, 2010, plaintiff "notified the Court that the U.S. Fish and Wildlife Service had concluded its 12-month review of the status of the Greater sage-grouse under the Endangered Species Act, 16 U.S.C. §§ 1531 et seq." and determined that "listing the greater sage-grouse (rangewide) is warranted, but precluded by higher priority listing actions." Pl.'s Notice of Supplemental Authority [#38] 1 (internal quotation omitted).

The sage grouse species range extends into 11 states and 2 Canadian provinces.

*W. Watershed Project v. Fish and Wildlife Serv.*, 535 F. Supp. 2d 1173, 1177 (D. Idaho

2007); *see also* Pl.'s Notice of Supplemental Authority [#38], Ex. A at 11 (table of

estimated sage grouse populations across 11 states and Canada). In this case, the BLM

evaluated the project's potential impacts on sage grouse within and around the PAPA.

As in *Selkirk*, I find that the BLM's decision to limit the geographic scope of its analysis

is entitled to deference, and that it had no obligation to assess the impact on the sage

grouse species as a whole. Thus, TRCP's claim on this ground must also fail.

Moreover, the BLM's analysis of the impacts on sage grouse within the PAPA

was complete. First, the BLM took into account the fact that increased development in

the PAPA was likely to have severe effects on the already-declining sage grouse

population. *See, e.g.*, AR 49411-13 (discussing declines in sage grouse population and

negative effects of wellfield development and associated surface disturbances); AR

49425 ("Throughout their range, greater sage-grouse have been adversely affected by

habitat loss due to agriculture, energy development, rural and urban housing, and roads,

as well as by habitat fragmentation from fences and powerlines. . . . Cumulative impact to

sagebrush by the Alternatives is expected to be substantial.").

Second, the BLM did consider the comments of the FWS with respect to sage

grouse. The FWS recommended greater protection of the sage grouse habitat consistent

with the objectives of the 2000 Memorandum of Understanding between the BLM and

the Western Association of Fish and Wildlife Agencies. AR 51279. The BLM directly

responded to this comment, noting that those objectives could not be met under intensive

20

natural gas development. AR 29784. The plaintiff suggests that because FWS has

expertise in wildlife management, BLM was required to defer to FWS's comment. But

that is not so. "Although an agency should consider the comments of other agencies, it

does not necessarily have to defer to them when it disagrees." *TRCP*, 605 F. Supp. 2d at

276 (quoting *Hughes River Watershed Conservancy v. Johnson*, 165 F.3d 283, 289 (4th

Cir. 1999)). As the defendants point out, BLM's reasoned disagreement that the sage

grouse habitats could not be fully protected consistent with the existing lease rights easily

satisfies NEPA's hard look requirement.

### d. BLM's discussion of mitigation satisfies NEPA.

TRCP's last claim with respect to the 2008 ROD is that the BLM failed to

properly acknowledge the collapse of AEM under the 2000 ROD and to include a

meaningful discussion of monitoring and mitigation requirements in the 2008 SEIS.

Though NEPA requires that an EIS contain a detailed description of mitigation measures

"to ensure that environmental consequences have been fairly evaluated, . . . it would be

inconsistent with NEPA's reliance on procedural mechanisms—as opposed to

substantive, result-based standards—to demand the presence of a fully developed plan

that will mitigate environmental harm before an agency can act." *Robertson*, 490 U.S. at

352-53 (citation omitted); *see also TRCP*, No. 09-5162, slip op. at 4 ("NEPA does not

require agencies to discuss any particular mitigation plans they might put in place, nor

does it require agencies—or third parties—to effect any.") (internal quotations omitted).

Instead, an agency's discussion of mitigation measures need only be "reasonably

complete." *Robertson*, 490 U.S. at 352. As the defendants point out, the allegedly

deficient implementation of AEM and malfunctioning of the PAWG under the 2000 ROD does *not* affect the BLM's otherwise detailed mitigation plans set out in the 2008 ROD. The mitigation plans the agency laid out in the SEIS are discussed above; because these plans are, at a minimum, "reasonably complete," the BLM did not violate NEPA in its discussion of mitigation.

## C. 2000 ROD

Finally, TRCP argues that the BLM's 2000 ROD violated both NEPA and FLMPA because AEM was never implemented, and seeks declaratory relief as to such. However, I decline to address these claims because the 2000 ROD was superseded in its entirety by the 2008 ROD, rendering these claims moot. *See* AR 48901.

"[A] federal court is authorized only to adjudicate actual, ongoing controversies, and thus may not give opinions upon moot questions or abstract propositions, or . . . declare principles or rules of law which cannot affect the matter in issue in the case before it." *Beethoven.com LLC v. Librarian of Congress*, 394 F. 3d 939, 950 (D.C. Cir. 2005) (quotations omitted). "In general a case becomes moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Murphy v. Hunt*, 455 U.S. 478, 481 (1982) (quotation omitted). In cases such as this, where the plaintiff seeks only declaratory relief, a question is moot unless judicial pronouncement will affect the defendant's behavior "towards the plaintiff." *Hewitt v. Helms*, 482 U.S. 755, 761 (1987) ("The real value of the judicial pronouncement—what makes it a proper judicial resolution of a 'case or controversy' rather than an advisory opinion—is in the settling of some dispute *which affects the behavior of the defendant*

*towards the plaintiff.*"). Accordingly, if a plaintiff disputes an already-completed action,

a request for declaratory relief is moot because judicial pronouncement can no longer

alter the defendant's behavior. *See Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*,

460 F.3d 13, 18 (D.C. Cir. 2006) (holding claim that BLM memo was issued in violation

of NEPA moot because memo had expired). TRCP seeks to have the Court declare that

the BLM violated NEPA and FLMPA by failing to implement the mitigation procedures

described in the 2000 ROD. Am. Compl. at 44. However, TRCP's claims concern a

decision that has been superseded and thus ceases to have any effect. *Cf. Fund for*

*Animals, Inc. v. Hogan*, 428 F.3d 1059, 1064 (D.C. Cir. 2005) (finding moot claims

regarding a FWS letter that was superseded in full by a belated 90-day finding).

Accordingly, TRCP's claims based on the BLM's actions under the 2000 ROD are moot.

TRCP argues that its claim is not moot because "the Court can effectuate a partial

remedy." Pl.'s Opp'n/Reply 7. But both in its pleadings and at oral argument, TRCP

failed to articulate what partial remedy it seeks with respect to the 2008 ROD.[8] Instead,

---

[8] TRCP relies on two Tenth Circuit cases to support its claim. Pl.'s Opp'n/Reply 15-16 (citing *Utah Env't Cong. v. Russell*, 518 F.3d 817 (10th Cir. 2008) and *Airport Neighbors Alliance, Inc. v. United States*, 90 F.3d 426 (10th Cir. 1996)). However, in both of those cases, an ongoing aspect of the completed agency decision at issue would continue to affect the plaintiffs. For example, in *Utah Environmental Congress,* the plaintiff challenged the Forest Service's decision to use a salt as a dust abatement mechanism. 518 F.3d at 823. Although the Forest Service contracted for just one application of salt, its Environmental Assessment (EA) called for road salt application "as needed." *Id.* at 824. Accordingly, the Tenth Circuit found that plaintiff's claims were not moot because plaintiff was subject to continued application of road salt so long as the EA remained in effect. *Id.* at 825. Similarly, in *Airport Neighbors Alliance*, the Tenth Circuit found that a challenge to an EA permitting expansion of an airport runway (that had been completed) was not moot because it could address "the environmental impacts resulting from the enhanced use of the runway." 90 F.3d at 429. I find these cases unpersuasive,

TRCP seeks suspension or modification of the 2008 ROD to redress the alleged wrongdoing it claims occurred in the implementation of the 2000 ROD. Thus, this Court would have to find that *both* the 2000 ROD and the 2008 ROD were unlawfully implemented before the Court can fashion the relief plaintiff seeks. However, for the reasons discussed above, I find that the BLM's adoption of the 2008 ROD lawful, leaving the Court with no remedy to address any alleged NEPA or FLMPA violations with respect to the 2000 ROD.

## CONCLUSION

For all the foregoing reasons, the plaintiff's Motion for Summary Judgment is DENIED, and the federal defendants' and defendant-intervenors' Cross Motions for Summary Judgment are GRANTED. An appropriate Order will accompany this memorandum opinion.

RICHARD J. LEON
United States District Judge

---

however, because unlike in those cases, TRCP is no longer subject to activity authorized by the agency decision, as the agency decision at issue—the 2000 ROD—has been superseded. Instead, all current activity in the PAPA is authorized by the 2008 ROD.